1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7   AARON CHANDRA,                          Case No.  16-cv-06076-JD
                     Plaintiff,
8
                                            **ORDER RE HABEAS PETITION AND**
9        v.                                 **CERTIFICATE OF APPEALABILITY**
10  PEOPLE OF THE STATE OF
    CALIFORNIA, et al.,
11
                     Defendants.
12

13          Petitioner Aaron Chandra, a California state prisoner, alleges multiple claims for habeas

14  relief under 28 U.S.C. § 2254.  Dkt. Nos. 1, 42.  The Court directed respondent to show cause why

15  the writ should not be granted.  Dkt. No. 4.  Respondent filed an answer, Dkt. No. 15, and Chandra

16  filed a traverse.  Dkt. No. 26.

17          The Court administratively closed the case to give Chandra an opportunity to exhaust state

18  law claims.  Dkt. Nos. 29, 34.  After he exhausted the claims, Chandra filed an amended petition

19  for habeas corpus.  Dkt. No. 42.  Respondent filed an answer, Dkt. No. 49, and Chandra filed a

20  traverse that incorporated by reference arguments made in his original traverse.  Dkt. No. 57; Dkt.

21  No. 61 at 2.  These are the operative pleadings for this order.

22                                   **BACKGROUND**

23          The California Court of Appeal provided a detailed account of the material facts and trial

24  proceedings.  *See People v. Chandra*, Nos. A138401, A143741, 2015 WL 3750001 (Cal. Ct. App.

25  June 15, 2015).  It summarized the evidence presented at trial:

26          "*The Prosecution's Case*

27          On August 29, 2010, Samir Hudieb arranged for the victim, Osana Saga, to purchase from

28          defendant four ounces of marijuana for $800.  About 2:00 p.m., Saga, Hudieb and a third

United States District Court
Northern District of California

1   person, Chris Faasisila, drove to defendant's house to make the purchase.  Saga gave

2   Hudieb the money to purchase the marijuana and Hudieb completed the purchase while the

3   others waited in the car.

4

5   After they drove away from defendant's house, Saga, Faasisila, and Hudieb weighed the

6   marijuana.  Saga, believing that defendant had shorted him an eighth of an ounce, told

7   Hudieb that he wanted either the missing eighth or a full refund and he would return all of

8   the marijuana that he purchased to defendant.  When Hudieb called defendant and told him

9   that they were missing an eighth of an ounce, defendant denied there was a shortage.

10  Hudieb told defendant that he was coming back to his house to show him the shortage.

11

12  When they returned, Saga and Hudieb entered defendant's garage while Faasisila waited in

13  the car.  Defendant was in the garage with a friend.  Hudieb told defendant that the

14  marijuana was short and that he could weigh the marijuana himself.  Defendant insisted

15  that it was not short.  Saga told defendant that he could give him the missing marijuana or

16  a refund.  When defendant pulled out a $20 bill to give to Saga, Saga became angry and

17  slapped defendant.  Then he and defendant '[held] onto each other' and they 'push[ed] off

18  each other' going in opposite directions.  Defendant then reached his arm up facing Saga

19  and Hudieb heard a loud bang.  Hudieb estimated that defendant was standing about seven

20  or eight feet away from Saga when defendant fired the shot.

21

22  Faasisila, who had stayed in the car at first, went to the garage when he heard the

23  argument.  From the doorway of the garage, he saw Saga arguing with defendant.  After

24  the shooting, he, Saga and Hudieb ran out of the garage.  On his way out Faasisila grabbed

25  a cell phone.  Saga collapsed on the sidewalk and was transported by ambulance to the

26  hospital, where he later died.

27

28

Following his arrest, defendant told the police, 'They just rushed into my house and told me to give them everything.  One of the guys punched me in the face and then told the other guy to give him the gun.  I went and got my gun.  Man, I'm scared.  Am I going to jail?'  After the incident, defendant called Hudieb and said that he shot Saga because Saga 'was trippin.'

Almost two years after the incident, in May of 2012, Hudieb was arrested following an alleged attack on defendant's brother.  Hudieb denied the attack and the case against Hudieb was eventually dismissed.  In January 2013, about a week and a half before his testimony at defendant's trial, a car belonging to Hudieb's girlfriend was spray-painted with the following:  'Fuck Samir,' 'You will pay,' 'Homo boy snitch,' 'Rat,' and 'You will die.'  Hudieb testified that he was 'uncomfortable' testifying but he was not concerned for his safety.  He was not scared of defendant and did not fear retribution.  He admitted that he had entered a use-immunity agreement with the prosecutor under which the prosecutor promised not to prosecute him for arranging the drug deal between defendant and Saga in exchange for Hudieb's promise to tell the truth at defendant's trial.

The police detective who interviewed defendant shortly after his arrest observed a scratch on his left ear, but no other visible injuries.  Defendant complained of soreness to the left of his face but declined the officer's offer to take him to a hospital.

*The Defense Case*

Defendant testified that he had been selling marijuana for approximately seven months prior to the shooting incident and admitted selling Hudieb four ounces of marijuana on the day of the shooting.  He claimed that he did not make a mistake when he weighed the marijuana.  When Hudieb called to say that the marijuana was short, he heard someone in the background say 'Tell him not to fuck with my money.  I got a cannon.'  Defendant told Hudieb to come to his house so they could resolve the dispute.  He felt threatened and went

United States District Court
Northern District of California

upstairs to retrieve his gun.  Hudieb entered the garage first, then Saga and Faasisila walked into the garage.  Saga and Faasisila were big and defendant noticed there was something shiny in Saga's belt and believed it was a gun.  Saga asked why the marijuana was short and told defendant to give him the money, then immediately punched him in the face.  When defendant attempted to offer Saga a little more than $20, Saga said, 'What the fuck is this?  I need everything you got.'  Then Saga started punching defendant again. Defendant did not believe Saga was going to stop hitting him or that he could run away. Defendant thought Saga was going to knock him unconscious or kill him.  Saga's last punch knocked defendant back against the wall.  When Saga came at him again with his fist back, defendant pulled out his gun and fired three times.

Defendant admitted that he originally lied to the police when he told them that he shot Saga because he saw Saga pulling a gun from his waistband.  He also admitted that he called his brother from jail and told his brother to make sure his friend, Huan Nguyen, who was present during the shooting, knew to tell the police that Saga had a gun sticking out of the right side of his waistband.  Defendant acknowledged that his intent was to have Huan corroborate the lie he had told the police.  Finally, he admitted that he had researched the law of homicide while in jail.

Defendant testified he did not 'think' that he tried to prevent Hudieb from testifying, but also claimed that would not be something he would remember.  Later, however, he denied threatening Hudieb or directing anyone to spray paint the car of Hudieb's girlfriend.  He did not know if his brother or any other of his associates had spray painted the car.

Huan Nguyen testified that he was in the garage at the time of the shooting.  He testified that Hudieb and Saga entered the garage within seconds of each other.  Faasisila came into the garage shortly after Saga, and he stood in the doorway.  Saga told defendant that it was not 'cool' to short him.  When defendant offered Saga at least a $20 bill, Saga got mad and

4

punched defendant.  Defendant and Saga fell out of Huan's view, but he heard a 'ruckus' for about 10 or 15 seconds and thought Saga was still hitting defendant.  Defendant lost his balance and did not appear capable of fighting back.  Then he heard gunshots, and Hudieb, Faasisila and Saga ran out of the garage.  He denied that defendant's brother called him to tell him to lie to police about the victim having a gun."

*Id.* at *1-3.

A jury convicted Chandra of second degree murder, possession of marijuana for sale, and firearm enhancements.  Dkt. No. 42 ¶ 1.  Chandra was sentenced to an indeterminate term of 15 years to life in prison for second degree murder, and a consecutive term of 25 years to life in prison for the firearm enhancement, for a total sentence of 40 years to life in prison.  *Id.* ¶ 2.

Chandra's amended petition alleges six grounds for federal habeas relief:  (1) the trial court failed to instruct the jury *sua sponte* under CALCRIM No. 3477 that the jury could presume that Chandra reasonably feared imminent death or great bodily injury because Saga was an intruder in his home; (2) the prosecution failed to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), regarding Saga's prior conviction for assault; (3) prosecutorial misconduct; (4) ineffective assistance of counsel; (5) the cumulative effect of these errors; and (6) that the trial court had discretion to strike the firearm use enhancement from Chandra' sentence because California Penal Code § 12022.53(h) applies retroactively.  *Id.* ¶¶ 120-26.

Chandra raised arguments one through five in his state court direct appeal and state habeas petition, and the court of appeal denied them on the merits.  *Id.* ¶ 3; *see also Chandra*, 2015 WL 3750001, at *1.  The California Supreme Court denied review.  Dkt. No. 42 ¶ 3.  After Chandra filed his initial federal habeas petition, the state legislature amended California Penal Code § 12022.53 to give trial courts discretion to strike firearm use enhancements from sentences.  The Court granted a stay and abeyance to permit Chandra to exhaust his claim that the amended statute applies retroactively.  Dkt. No. 34.  The state superior court denied relief, and the court of appeal affirmed without an opinion.  Dkt. No. 49-3, Exs. 15, 17.  The California Supreme Court denied review, and Chandra filed an amended federal habeas petition adding the newly exhausted claim.  *Id.* Ex. 19; Dkt. No. 42.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL STANDARDS**

When a state court decides a claim on the merits, habeas relief can be granted only if the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2); *see also Demacedo v. Koenig*, No. 19-cv-05815-JD, 2022 WL 4280643, at *1-2 (N.D. Cal. Sept. 15, 2022); *Garcia v. Lizarraga*, No. 19-cv-02083-JD, 2021 WL 242880, at *2 (N.D. Cal. Jan. 25, 2021).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), and the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id*. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  The Court presumes the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court that considered the petitioner's claims, the Court looks to the last reasoned opinion from a lower court. *See Nunnemaker*, 501 U.S. at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

For claims one through five of Chandra's petition, the Court looks to the decision by the California Court of Appeal. *Chandra*, 2015 WL 3750001. For claim six, the Court looks to the decision by the Alameda County Superior Court. Dkt. No. 49-3, Ex. 15. The state courts rejected all six claims on the merits. *Chandra*, 2015 3750001, at *1; Dkt. No. 49-3, Ex. 15. Consequently, the deferential standard of review under 28 U.S.C. § 2254(d) applies. *See Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

## DISCUSSION

## I.   INSTRUCTIONAL ERROR

Chandra's lead argument is that the trial court failed to give the jury a "home intruder" instruction under CALCRIM No. 3477 to the effect that Chandra was entitled to a rebuttable presumption that he feared imminent injury or death because Saga was an intruder in his home.[1] Dkt. No. 42 at m-1.[2] Chandra says that this violated his constitutional rights to due process, a

---

[1] CALCRIM No. 3477 is based on the presumption in Cal. Penal Code § 198.5, and states: "The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself) [, or to a member of (his/her) family or household,] if: 1. An intruder unlawfully and forcibly [entered/ [or] was entering] the defendant's home; 2. The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly [entered/ [or] was entering] the defendant's home; 3. The intruder was not a member of the defendant's household or family; AND 4. The defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home. [*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.] The People have the burden of overcoming this presumption. This means that the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself)[, or to a member of his or her family or household,] when (he/she) used force against the intruder. If the People have not met this burden, you must find the defendant reasonably feared death or injury to (himself/herself)[, or to a member of his or her family or household]." *Chandra*, 2015 WL 3750001, at *3 n.3.

[2] The "m-1" citation is Chandra's page numbering format and refers to the Memorandum of Points of Authorities section of his petition. *See* Dkt. No. 42.

United States District Court
Northern District of California

complete defense, a jury trial, and to be convicted only by proof beyond a reasonable doubt. *Id.* at m-1-2.  The court of appeal found no instructional error because there was no evidence that Saga unlawfully or forcibly entered Chandra's garage. *Chandra*, 2015 WL 3750001, at *3-4.

**A.    Background**

At trial, Chandra's counsel asked the court to instruct the jury with CALCRIM No. 3477 and then withdrew the request. *Id.* at *4.  The court instead instructed the jury with CALCRIM No. 506 (Justifiable Homicide:  Defending Against Harm to Person Within Home or Property).[3] *Id.*

The trial court stated that "we had some fairly lengthy discussions with respect to the question of self-defense as it relates to the instructions that specifically deal with defending property or a home versus an individual exercising the right of self-defense and I think we agreed that the facts of the case as they came in do not lend themselves to the instructions that have to do with the defense of a home or property." *Id.*  The prosecutor and Chandra's counsel agreed, and Chandra's counsel said "I agree with all the instructions that will be given.  I have ... no objection to them.  I have not requested any instructions that the court will not give ... To the extent that that's at odds with what I filed with the court, I would withdraw my request for any instructions that will not be given." *Id.*  The trial court concluded, "I'll give 506, which is defending against harm to a person within home or property, which is more appropriate as opposed to ... 3477, which has to do with presumptions that applies when there's forcible entry.  And I think we agreed that while there was entry into a home, it was not forcible." *Id.*

The court of appeal found there was no instructional error because there was "no substantial evidence that Saga 'unlawfully and forcibly' entered defendant's garage sufficient to

---

[3] Under CALCRIM No. 506, the jury was instructed: "The defendant is not guilty of murder or manslaughter if he killed to defend himself in the defendant's home.  Such a killing is justified, and therefore not unlawful if:  1.  The defendant reasonably believed that he was defending a home against Osana Saga who entered that home intending to commit an act of violence against Aaron Chandra; 2.  The defendant reasonably believed that the danger was imminent; 3.  The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; AND 4.  The defendant used no more force than was reasonably necessary to defend against the danger." *Chandra*, 2015 WL 3750001, at *8.

United States District Court
Northern District of California

support the omitted instruction." *Id.*  It first found there was no unlawful entry:  "section 198.5 does not define unlawful or forcible entry.  However, other statutory provisions do.  Unlawful entry is defined in section 602.5, subdivision (a) as the entry of a 'noncommercial dwelling house ... without consent of the owner.'  The record does not support the conclusion that Saga entered defendant's garage without consent.  Defendant testified that he told Hudieb to come to his house to resolve the discrepancy and that when Hudieb 'called me and told me that he was outside ... I told him to come to the back.'  Although defendant testified that he did not invite Saga into his home, he clearly invited Hudieb into the garage.  He knew that Hudieb was with Saga and never indicated that Saga was not to enter the property with Hudieb." *Id.*

The court of appeal also found "no evidence that Saga's entry into the garage was forcible." *Id.*  It explained that under California law, "[e]very person is guilty of a forcible entry who … [b]y breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror enters upon or into any real property." *Id.* (quoting Cal. Civ. Pro. § 1159).  The court found no evidence that Saga used violence or threats to enter Chandra's garage and consequently found no instructional error in omitting CALCRIM No. 3477. *Id.*

**B.    Discussion**

A challenge to a jury instruction as an error under state law is not a cognizable claim in federal habeas proceedings. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Consequently, the court of appeal's finding that the jury instructions were correct under state law is binding on this court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief.").

Chandra's claim of state court instructional error may be the basis of federal habeas relief only if it "so infected the entire trial" that he was deprived of due process. *See Estelle*, 502 U.S. at 72.  Chandra has not crossed this threshold.  Due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Clark v. Brown*, 450 F.3d 898,

9

904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  A criminal

defendant is entitled to adequate instructions on the defense theory of the case.  *See Conde v.*

*Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on

simple kidnapping where such instruction was supported by the evidence).  But due process does

not require that an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456

U.S. 605, 611 (1982); *Menendez*, 422 F.3d at 1029.

The omission of an instruction is less likely to be prejudicial than a misstatement of the

law.  *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431

U.S. 145, 155 (1977)).  Chandra consequently bears "an especially heavy burden" in establishing

that the trial court's failure to give the CALCRIM No. 3477 instruction deprived him of due

process.  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at

155).  The significance of the omission of such an instruction may be evaluated by comparison

with the instructions that were given.  *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001)

(quoting *Henderson*, 431 U.S. at 156).

As noted by the court of appeal, the evidence did not support giving the CALCRIM No.

3477 instruction because there was no evidence that Saga unlawfully or forcibly entered

Chandra's home.  *Chandra*, 2015 WL 3750001, at *4.  Chandra argues that a "forcible entry" does

not require a breaking under *People v. Brown*, 8 Cal. Rptr. 2d 513, 517 (Cal. Ct. App. 1992).  Dkt.

No. 42 at m-2-3.  The court of appeal rejected this argument as "entirely misplaced" because in

*Brown*, "there was no dispute that the entry was forcible." *Chandra*, 2015 WL 3750001, at *4.

Rather, "the question on appeal was whether the homeowner's unenclosed front porch was part of

his 'residence' for purposes of section 198.5.  To answer that question the court looked to legal

authority regarding what constitutes a residence for purposes of a burglary.  Because 'unlawful

entry' is defined by the Penal Code, we need not rely on analogy to determine its meaning." *Id.*

The state court's determination that, as a matter of state law, there was insufficient evidence to

warrant the CALCRIM No. 3477 instructions "should be the final word on the subject," and

Chandra has not shown otherwise.  *Menendez*, 422 F.3d at 1029.

10

1

2        Even if there were an instructional error, which is not the case, any prejudicial effect would

3   have been minimal because Chandra was still able to present evidence of self-defense.  The jury

4   was given the CALCRIM No. 506 instruction, which explained that it was "lawful" for Chandra to

5   defend himself from attack if he "reasonably believed that he was defending a home against Osana

6   Saga who entered that home intending to commit an act of violence against Aaron Chandra,"

7   "reasonably believed that the use of deadly force was necessary to defend against the danger," and

8   he used "no more force than was reasonably necessary." *Chandra*, 2015 WL 3750001, at *8.

    Habeas relief is denied on this claim.

9   **II.     BRADY ISSUE**

10       Chandra says that he was denied the right to a fair trial when the prosecution did not

11  adequately disclose Saga's prior criminal history.  Dkt. No. 42 at m-5-9.  He also says the court of

12  appeal rejected this claim based on an unreasonable determination of the facts because, without

13  holding an evidentiary hearing, it found that the prosecution had disclosed the fact of Saga's prior

14  conviction and the full details of the conviction were available in the public record.  *Id.* at m-10-

15  12; *Chandra*, 2015 WL 3750001, at *12-13.

16       **A.     Background**

17       The court of appeal summarized the relevant factual background for this claim:

18       "Here, prior to trial defense counsel asked the court to order the People to disclose all of

19       the victim's prior convictions for violence, and the prosecutor stated that it had given the

20       evidence to the defense, including the evidence of the victim's 2003 conviction under

21       section 245, subdivision (a)(2).  The court indicated that the conviction was in Alameda

22       County and stated that it intended to get the file and familiarize itself with the facts prior to

23       making a ruling on the admissibility of the prior conviction.  Ultimately, the trial court

24       admitted the character evidence and read the parties' stipulation to the jury:  'On May 16th,

25       2003, Osana Saga pointed a handgun at a person in the city of Hayward.  Mr. Saga did not

26       fire the handgun and did not strike anyone with the handgun.'

27

28

Defendant contends the prosecutor committed *Brady* error by not disclosing to the defense further details of the conviction.  Defendant's habeas petition alleges, 'Present counsel had an attorney in their office examine the criminal case records in Alameda County and found that on December 2, 2003, Osana had indeed been convicted of assault with a firearm, section 245(a)(2), in case no. H34844B.  The public portion of the file also indicated, however, that Osana had been sentenced to 4 years in prison, that the charges had arisen out of the attempted robbery of a liquor store, that Osana had been arrested and charged with assault with force likely to commit great bodily injury, Penal Code section 245(a)(4), and attempted second degree robbery, Penal Code section 211, and that Osana had committed these acts with an accomplice who was also charged with Penal Code section 245(a)(1), assault with a deadly weapon other than a firearm.  The non-public portion of the file was obtained through motion.

The reported facts were as follows:  On May 16, 2003, an Alameda County Sheriff's Deputy went to Hank's Liquor Store in Hayward in response to a silent alarm and interviewed Dalbir Kaur, a woman in her late 40s, and Harinder Padda, a man in his twenties.  The two were owners of the store and were working as clerks.  Kaur was 'visibly upset and was crying and occasionally wailing in a loud voice.'  Padda, a man in his twenties, 'had an abrasion to his left temple area and was bleeding from his nose.'  They made the following statements to the police:  'On 051603, about 8:44 am, I was at work sitting near the cash register at Hank's Liquor.  I heard my mom, Kaur Dalbir, start screaming.  I stood up and saw a hispanic male grab my mom by her hair and start pulling and dragging her.  That guy looked like he was holding a small hand gun in his right hand.  There was a second guy who was hispanic that walked towards me and grabbed at me.  We started fighting, and fell to the floor near the cash register.  He punched me with both fists over five times.  He also picked up a plastic baton that we keep behind the register and hit me at least three times with it, and then ran out of the store with the first guy.  I followed them into the parking lot and saw them get into a white Cougar with a black top, with a

12

partial plate VXX.  They did not get any money or property while in the store.  I did not hear the hispanic guys say anything while in the store.  I recognized the guy who attached me as a customer that has shopped in our store in the past.  I can recognize both guys if seen again.  I got some small scratches on my face but I do not need any medical attention.  When I followed them outside the guy who attacked my mom pointed the small gun at me.  I backed away and went back into the store.  The first guy was wearing a black hooded jacket and blue jeans.  The guy who attached me was wearing a black jacket.  This is a true statement.'

'On 051603, about 8:44 am, I was at work stacking shelves at Hank's liquor.  I am one of the owners of the store.  I was bending down putting items on the shelf when I was grabbed from behind by an unknown person.  He did not say anything to me.  He pulled me by my hair and dragged me about 20 feet through the store.  I did not know what was happening.  I was so frightened that I urinated in my pants.  He pulled me over near the cash register area and held me down.  He held me for several seconds and then ran out of the store.  I did not see the person who grabbed me very well.  I do not know if I can identify the person if seen again.  My head hurts where my hair was pulled, but I do not want or need medical treatment.  This is a true statement.  The guy who attacked my son came into the store about 7:30 am and asked if he could cash a check, but he left without doing so.  I can recognize him if seen again.'"

*Chandra*, 2015 WL 3750001, at *12.

The court of appeal found that "[t]he prosecution satisfied its responsibility by disclosing the existence of the victim's conviction.  As the defendant has demonstrated, the details of Saga's conviction were available to the defense in the court file."  *Id.* at *13 (citing *People v. Morrison*, 101 P.3d 568, 580 (Cal. 2004)).

**B.    Discussion**

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  To succeed on his *Brady* claim, Chandra must show: (1) that the evidence at issue is favorable to him, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued).  *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Garcia*, 2021 WL 242880, at *4; *Bennett v. Asuncion*, No. 16-cv-01918-JD, 2018 WL 3344315, at *16 (N.D. Cal. July 9, 2018).

"[I]f 'the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence,' the government's failure to bring the evidence to the direct attention of the defense does not constitute 'suppression.'"  *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (quoting *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006)); *see also United States v. Bond*, 552 F.3d 1092, 1095-96 (9th Cir. 2009) (no suppression of evidence where government discloses all information necessary for defense to discover alleged *Brady* material on its own); *Mullins v. Foulk*, No. 14-cv-00858-JD, 2015 WL 5935325, at *9 (N.D. Cal. Oct. 13, 2015) ("Where the defendant is aware of the facts, the prosecutor does not commit a *Brady* violation.").

Chandra has not shown that the court of appeal's *Brady* analysis was unreasonable or contrary to Supreme Court precedent.  The court reasonably concluded that there was no suppression because the prosecutor disclosed the existence of Saga's criminal conviction, and Chandra's state habeas counsel was able to examine the public and non-public portions of Saga's court file.  *Chandra*, 2015 WL 3750001, at *13.

Nor has Chandra shown that the court of appeal's analysis was based on an unreasonable determination of the facts.  Chandra faults the court for not holding an evidentiary hearing, which he contends was needed to determine if the prosecutor knew about the details of Saga's criminal conviction.  Dkt. No. 42 at m-6, m-10.  But Chandra acknowledges that the prosecutor's subjective knowledge is irrelevant to whether *Brady* suppression occurred.  *Id.* at m-6 ("[E]ven if the prosecutor did not personally know about the *Brady* evidence, *Brady* suppression occurs even when the evidence not turned over is 'known only to police investigators and not to the prosecutor.'") (citing *Wearry v. Cain*, 577 U.S. 385, 393 n.8 (2016)).

United States District Court
Northern District of California

1    Chandra also says that an evidentiary hearing was needed for the court of appeal's findings

2    that the prosecution disclosed the existence of Saga's prior conviction and that defense counsel

3    could have learned of the details of that conviction through investigation.  *Id.* at m-10.  In

4    Chandra's view, the court of appeal "assumed a record that wasn't there," and "this court can't tell

5    whether the prosecutor turned over anything more than was in the contents of the gun-pointing

6    stipulation."  *Id.* at m-10, m-12.

7         The problem for Chandra is that the prosecutor disclosed the existence of Saga's 2003

8    conviction to Chandra and the trial court, and the jury was told that Saga had "pointed a handgun

9    at a person."  *See* Dkt. No. 16-2 at 6, 8; Dkt. No. 16-5 at 654-55.  The record also establishes that

10   Chandra's state habeas counsel used the same information to examine the public portion of Saga's

11   file, which showed that Saga had been sentenced to four years in prison, and that he had been

12   charged with assault with force likely to commit great bodily injury and attempted second degree

13   robbery.  *See* Dkt. No. 17-2 ¶ 110.  Chandra's state habeas counsel was able to review the non-

14   public portion of Saga's file and learn the full details of the crime.  *Id.* ¶¶ 111-14.  In these

15   circumstances, the court of appeal did not err in its *Brady* analysis or make an unreasonable

16   determination of the facts in the record.  Habeas relief is denied on this claim.

17   **III.   PROSECUTORIAL MISCONDUCT**

18        Chandra contends that the prosecutor engaged in multiple instances of misconduct that

19   deprived Chandra of a fair trial and due process.  Dkt. No. 42 at m-15-16.  Chandra states that the

20   prosecutor, Brian Owens, has been found to have engaged in misconduct on at least two prior

21   occasions.  *Id.* (citing *People v. McKenzie*, No. A112837, 2007 WL 2193548, at *7-9 (Cal. Ct.

22   App. Aug. 1, 2007), and *Tatmon v. Haviland*, No. C 09-0094 WHA (PR), 2011 WL 2445854, at

23   *5-6 (N.D. Cal. June 16, 2011)).

24        In the state court appeal, Chandra acknowledged that his trial counsel did not object to any

25   of the alleged acts of misconduct.  *Chandra*, 2015 WL 3750001, at *6.  Chandra argued that the

26   misconduct was so "pervasive and intentional" that an objection was not required to preserve the

27   issue, or alternatively, that his counsel was ineffective in failing to object.  *Id.*  The court of appeal

28

determined that Chandra had forfeited all the misconduct claims by failing to object, but exercised its discretion to review the claims on the merits and found no prejudicial misconduct. *Id.* at *6-15.

### A.     Background

#### 1.     Discussion of threats against a prosecution witness.

Chandra says that the prosecutor improperly suggested that Chandra had threatened Hudieb, a key prosecution witness. Dkt. No. 42 at m-16-18.  Hudieb testified that threats against him were spray-painted on his girlfriend's car about a week and a half before Chandra's trial. *Chandra*, 2015 WL 3750001, at *2.  During his closing argument, the prosecutor said that if Chandra "tried to ... discourage someone from testifying against him, this may show that he was aware of his guilt." *Id.* at *4.  The prosecutor described the threats against Hudieb and reminded the jury that when Chandra was asked whether he tried to prevent Hudieb from testifying, he initially responded "I don't think so" and that he "wouldn't remember that.'" *Id.*

The court of appeal rejected Chandra's argument that the prosecutor committed misconduct by referring to his "evasive denials" and failing to mention his explicit denials made shortly thereafter. *Id.* at *5 n.6.  The court concluded that "[t]he prosecutor had no obligation to highlight testimony that he did not find credible or persuasive." *Id.*

#### 2.     Attacks on Chandra's defense.

Chandra says the prosecutor improperly asked if he had studied the law of homicide, with the implication that Chandra did so to fabricate a defense. Dkt. No. 42 at m-18.  In an opening statement, defense counsel said that Chandra acted in self-defense and lied to police about seeing Saga reach for a gun because he "panicked" and "didn't know the law of homicide." *Chandra*, 2015 WL 3750001, at *5.  On cross-examination, Chandra testified that "since being in jail he had researched the law of homicide and that he now knew the different standards applicable in a homicide case." *Id.*  The prosecutor referred to this testimony in his closing argument:  "This is the defense he's going for.  This is why he changed his story.  It's called imperfect self-defense.  And basically if a defendant actually believes that he's in danger, then he can protect himself." *Id.*

The court of appeal declined to find misconduct.  "Defense counsel clearly had a tactical reason for telling the jury that defendant did not know the law of homicide at the time of his arrest.

It was part of his explanation for why defendant lied to the police following his arrest--that because defendant was unfamiliar with the law, he did not know that the truth of what had actually happened was enough to support a defense to the shooting.  The prosecution's follow up questions were perfectly reasonable under the circumstances and no objection was warranted.  Contrary to defendant's argument, a juror would not reasonably have understood the prosecution's questions, nor his subsequent closing argument, as implying that defendant's attorney, rather than the defendant, was presenting a false defense." *Id.* at *6.

Chandra says that the prosecutor improperly accused defense counsel of reserving his opening statement in the hope that prosecution witnesses would not testify or would lie for Chandra.  Dkt. No. 42 at m-18.  This is also said to imply that Chandra and defense counsel "were trying to fabricate a defense." *Id.*

The court of appeal rejected this argument.  It found that a reasonable jury was not likely to understand the prosecutor's statements "as an attack on the integrity of defense counsel." *Chandra*, 2015 WL 3750001, at *7.  Instead, the court explained, "[t]he prosecutor was identifying the reliability issues of the witnesses and highlighting defense counsel's potential strategy for managing these credibility concerns." *Id.*

The court also found that the prosecutor's statements about the defense's strategy were not false or misleading:  "What defendant 'knew' about the testimony of these witnesses does not change the fact that there was still considerable uncertainty regarding their actual testimony.  The prosecution's suggestion that the defense may have had a tactical reason to delay opening argument was not unreasonable or unfounded under the circumstances." *Id.*

### 3.  Arguing facts outside the record and misstating the record.

Chandra says that the prosecutor improperly referenced facts outside the record and misstated the record.  Dkt. No. 42 at m-19-21.  In closing argument, the prosecutor stated that the angle at which the bullet travelled through Saga's body suggested that Saga was ducking or running away from Chandra when he was shot. *Id.* at m-19-20.  The court of appeal found that "[t]he prosecutor's argument that Saga may have been ducking when defendant shot him is within

1    the bounds of permissible argument and expert testimony was not necessary to support such an

2    argument." *Chandra*, 2015 WL 3750001, at *11.

3         Chandra says that the prosecutor's statements that Chandra "slowly" raised the gun and

4    "could have shot [Saga] while chasing him out the door" lacked any support from the record. *Id.*;

5    Dkt. No. 42 at m-20. The court of appeal acknowledged that "there was no testimony supporting

6    the argument that defendant 'slowly' positioned the gun before firing or that he chased the victim

7    before firing." *Chandra*, 2015 WL 3750001, at *11. But it noted that the jury was instructed to

8    use "only the evidence that was presented in this courtroom," and found that "[b]ecause the

9    evidence was fairly consistent regarding the manner in which defendant held and fired the gun,

10   there is no likelihood the jury would have adopted the prosecutor's statements as evidence." *Id.*

11        Chandra contends that the prosecutor misrepresented the terms of Hudeib's immunity

12   agreement. Dkt. No. 42 at m-20. The prosecutor told the jury that Hudieb was given immunity

13   from prosecution for selling marijuana, and that he would not have testified unless he had been

14   given immunity. *Id.* Hudieb's immunity deal included immunity from prosecution for all

15   offenses other than perjury, including aiding and abetting murder. *Id.*; *Chandra*, 2015 WL

16   3750001, at *11. The court of appeal acknowledged that the prosecutor's statements were

17   incorrect, but found no misconduct because the prosecution "was under no obligation to detail for

18   the jury every potential crime for which Hudieb might have been charged," and it was "a

19   reasonable inference under the circumstances that Hudieb would not have testified without

20   immunity." *Chandra*, 2015 WL 3750001, at *11.

21        Chandra says that the prosecutor misrepresented Saga's criminal history by failing to

22   disclose the full details of his assault conviction and arguing that "[i]f there was any kind of arrest

23   for, you know, I hit somebody at the supermarket, you know, anything, it comes in." Dkt. No. 42

24   at m-20-21. Chandra also says that the prosecutor misleadingly stated that Saga had no

25   convictions from 2004 to 2007, even though Saga was in prison for the assault conviction during

26   that time. *Id.* The court of appeal found no misconduct because the prosecutor did not suppress

27   the evidence of Saga's prior conviction, and "the record does not establish what the prosecutor

28   knew about the duration of [Saga's] incarceration," and "his statement remains true that Saga,

whether or not incarcerated, did not have a record of violent criminal convictions occurring after 2003." *Chandra*, 2015 WL 3750001, at *13.

### 4.      Misstating the law.

Chandra says that the prosecutor repeatedly misstated the law during closing argument. Dkt. No. 42 at m-21-24.  After establishing that the jury was properly instructed on the applicable law of homicide, voluntary manslaughter, and self-defense, the court of appeal discussed the alleged misstatements in detail:

> "Defendant argues that despite the correct instructions, during closing argument the prosecutor repeatedly and prejudicially misstated the law.  Defendant contends that the prosecutor misstated the law regarding second degree murder by arguing that when two people are engaged in a fist fight and one pulls out a gun and kills the other or when a drug dealer shoots and kills an unarmed person, it is second degree murder.  [8]
>
> [8]  Specifically, the prosecutor argued:  'It's a case of second degree murder because basically he pulled out a gun during a fist fight.  It happens all the time.  It happens on BART.  It happens in school yards.  It happens everywhere.  People get in fights.  Road rage cases, people get beat up.... When one person pulls out a gun, when one person pulls out a knife and elevates it from a fist fight, no matter how bad, it's murder.  It's not first degree murder, but it's second degree murder.'  The prosecutor also argued that defendant should be treated 'the same as any other drug dealer who pulls out a gun and shoots and kills an unarmed person, even if provoked, even if hit, even if slapped, even if pushed.  In the State of California, that's second degree murder.  And I ask that you return that verdict accordingly.'
>
> Defendant's characterization of the prosecutor's argument as a misstatement of the law is highly questionable.  The prosecutor was not stating the law but rather arguing about its application to the facts in this case.  In the first instance, the prosecutor argued that when one pulls out a gun during a fight, as compared to a baseball bat, it evidences an intent to

United States District Court
Northern District of California

19

kill and when one intentionally pulls the trigger of the gun, as compared to an accidental discharge, it evidences a conscious disregard for human life.  The second alleged misstatement was merely a summary of the prosecutor's closing argument.  Given the lengthy instructions on the applicable law, neither comment was likely to be understood as a complete statement of the law.

Defendant also argues that the prosecutor committed misconduct in arguing, 'When somebody is convicted of voluntary manslaughter, they're getting away with murder.' There was no prejudice in the prosecution's characterization of voluntary manslaughter as 'getting away with murder.'  As noted, the jury was properly instructed that '[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone' either in the heat or passion/sudden quarrel or with imperfect self-defense.  The prosecutor's comment plainly reflected no more than his contention of how the evidence in this case should be viewed[.]  While perhaps uncalled for, the statement could not reasonably have been understood as a statement of the law and did not constitute prejudicial misconduct.

Next, defendant argues that the prosecutor committed misconduct in arguing that heat-of-passion manslaughter requires that a reasonable person would have acted the same way, while equating 'reasonable person' with 'juror,' and arguing that a jury member would have had to find that he or she would have shot a customer over a drug deal.  The prosecutor explained that to find defendant guilty of voluntary manslaughter, the jury would have to find that defendant acted 'under intense emotion that would obscure reason and judgment, and an average person would have acted the same way.  So in other words, when we talk about an average person or a reasonable person, we're talking about you. Just an average member of the community, which all of you are.  They're in various instructions.  There's what's called the reasonable person standard or the average person standard, that's you.'  The prosecutor argued that heat-of-passion voluntary manslaughter

1    was not applicable in this case because defendant 'brought that gun into the garage

2    knowing he would use it.... He's a drug dealer.  He knows there are disputes over drug

3    dealing.  This is not an unexpected situation for a drug dealer to have a dispute with a

4    customer.  So you don't have the situation where he would never have foreseen it.  All of a

5    sudden he's in the middle of something he could have just never fathomed.... And that's

6    why I'm confident that you, as an average person, would not have been an armed drug

7    dealer, shooting a customer over a dispute because the customer smacked you around

8    enough to cause a scratch.'

9

10   Defendant's objection to this argument is two-fold.  First, he argues that the prosecutor

11   improperly encouraged jurors to impose their own subjective judgment rather than

12   applying an objective standard.  In *People v. Mendoza* (2007) 42 Cal.4th 686, 703, the

13   court explained, 'The reasonable person is a hypothetical individual who is intended to

14   represent a sort of average citizen.  Therefore, it is one thing to refer to the jurors as

15   members of society in the course of explaining the reasonable person standard as a means

16   of determining whether a killing was caused by an event or situation that probably would

17   cause a reasonable person to lose self-control and kill.  Accordingly, it was not misconduct

18   for the prosecutor to tell the jury 'And who is the ordinarily reasonable person?  You folks

19   are.'  It is another thing, however, to imply that the jurors, as individuals, can substitute

20   their own subjective standard of behavior for that of the objective, reasonable person.

21   Statements such as, 'Would any of you do what he did here and say that's reasonable?

22   Would any of you do that?  No.  Would any of you put a gun to people's heads?  Would

23   any of you do what he did here?' appear to encourage jurors to impose their own subjective

24   judgment in place of applying an objective standard.  It is here that the prosecutor went too

25   far, committing misconduct.'  Viewing the prosecutor's statements in this case in context,

26   we do not believe his argument can reasonably be understood to encourage subjective

27   reasoning.  The prosecutor spoke repeatedly of what an 'average person' would do under

28

United States District Court
Northern District of California

1    the circumstances, and asked, in effect, what would 'you, as an average person,' do?  This

2    was hardly an invitation for the jurors to apply their own individual standards.

3

4    Defendant also notes, correctly, that the argument incorrectly states the law insofar as it

5    suggests that to find voluntary manslaughter the law requires a showing that an average

6    person would have shot and killed the victim under the circumstances shown by the

7    evidence.  However, all that is required is that an average person in the same situation

8    would have acted 'rashly and without due deliberation.' (CALCRIM No. 570; *People v.*

9    *Najera* (2006) 138 Cal.App.4th 212, 223 ['The focus is on the provocation--the

10   surrounding circumstances--and whether it was sufficient to cause a reasonable person to

11   act rashly. How the killer responded to the provocation and the reasonableness of the

12   response is not relevant to sudden quarrel or heat of passion.'].)  The misstatement appears

13   harmless, however, when considered in the context of the instructions that were given and

14   the remainder of the prosecutor's argument.  The clear import of the argument quoted

15   above is that a reasonable person would not have acted rashly and without due deliberation

16   "because [a] customer smacked you around enough to cause a scratch."

17

18   Defendant also argues that the prosecutor committed misconduct in arguing that heat-of-

19   passion manslaughter requires provocation as extreme as the person being pummeled on

20   the ground and just barely able to draw gun and fire it.  As defendant notes, the prosecutor

21   argued that 'this is not a situation where he's on the ground being pummeled, his head's

22   hitting the pavement, he just reaches for his [gun] and he's barely able to get it out and fire

23   it.'  The prosecutor, however, was not discussing the sufficiency of the provocation when

24   this comment was made.  Rather, the preceding phrase makes clear that the argument was

25   directed to whether defendant was acting irrationally or with due deliberation and

26   reflection when he fired the gun.[9]

27

28

United States District Court
Northern District of California

[9] The full sentence reads, 'And we know when he fired--and again this goes to acting irrationally and [with] intense emotion--this is not a situation where he's on the ground being pummeled, his head's hitting the pavement, he just reaches for his [gun] and he's barely able to get it out and fire it.'

Defendant also argues that the prosecutor committed misconduct in arguing that self defense requires that defendant sustain great bodily injury such as a concussion or broken bones. As set forth fully above, both forms of self defense required findings by the jury that the defendant believed that he was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against that danger. The instructions explained that great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The prosecutor argued that '[g]reat bodily injury is you go to the hospital, you have to be sent to the hospital. Anything less than that is moderate harm. So if this was a fight and he had gotten a gash on his forehead with stitches, that would be moderate harm. Even a broken nose that could be reset, that would likely be moderate harm. Certainly scratches and bruises are minor. But something that was substantial, that was significant, if he got a major concussion and you have gashes all over, you know, broken bones, then that would be a significant or serious injury that would send him to the hospital. That's what great bodily injury requires.'

The prosecutor's comments did overstate the definition of great bodily injury, but read in context they do not amount to prejudicial misconduct. The prosecutor's comments were prefaced with the statement that to find that defendant was acting in imperfect self-defense, the jury must find that he actually believed he was in imminent danger of death or great bodily injury. The prosecutor suggested that the jury could look to the injuries suffered by defendant, including a scratch and some abrasions to one side of his face, to help determine whether he actually believed he was in imminent danger of death or great bodily injury and

23

whether deadly force was necessary at that moment.  Immediately following his statements quoted above, the prosecutor asked 'So what is his actual belief?'  The prosecutor argued that to determine defendant's beliefs, the jury should consider defendant's statements at the time of his arrest that Saga 'had a gun too, which made me pull mine out.  I wouldn't have pulled it out if he was to beat me up' and that 'I'm not gonna do nothing for him beating me up though.  Once he reaches for that gun, I'm pulling mine out and he reached for it and that's when I pulled mine out.'  Relying on these statements, the prosecutor argued, 'So his actual belief was ... he knew he didn't have to shoot the victim.  He knew it.  I'm sure he was a little bit scared, but he was also pissed.'  Contrary to defendant's suggestion, the prosecution's comments did not require defendant to 'show that he feared a specific type of injury to be entitled to the defense.'  The point the prosecutor was making was that defendant did not believe he was about to suffer injuries from 'getting beaten up' that could be avoided only by the use of deadly force.

Defendant also argues that the prosecutor committed misconduct in arguing that if Saga had broken into defendant's home, there would have been different instructions and that self defense against forcible entry means you have to be asleep and someone breaks into your home at night.  The prosecutor's argument in this regard was relatively limited.  Before discussing the instructions given on self defense in one's home or property, he explained, 'Before I go through this instruction, if you think the standard here is really high for a homeowner, understand that if this had been a situation where somebody had forcefully broke into his home, it would be a totally different instruction.  So this was not a situation where, you know, you're asleep at night and somebody breaks into your home.  You'd have an entirely different set of instructions, a totally different standard.'  We do not believe, as defendant suggests, that a reasonable juror 'could have inferred from this argument that the judge thought petitioner had no right to self defense under the facts presented.'

1      Finally, defendant argues that the prosecutor misstated the law of robbery in his rebuttal

2      argument.  The allegedly objectionable part of the prosecutor's argument is as follows:

3      'There's no evidence of robbery here, even by [defendant's] friend Huan.... Huan admitted

4      when I was asking him that what he originally told the police was true, which is the victim

5      didn't come in until 30 seconds to a minute after Samir.  And then when Chris comes in,

6      everything's already started.  And the important thing that Huan tells us is Chris didn't

7      even grab his phone until after the gunshots.  Huan testified that he had his phone sitting

8      on the chair.  And after the gunshots, when Chris is running out, he grabs the phone on the

9      way out.  So it's not like Chris came in, grabbed the phone and now we have gunshots.

10     That happened after.... And there were no weapons.  So if you're coming in to rob

11     somebody, you don't know what's going to be in the garage, you're at least going to bring

12     some sort of weapon in.  You're all three going to come in.  That's not how this went

13     down.  That's not what happened here.  And all of the witnesses, Huan, Samir, and Chris

14     say that.  This was not a robbery.  And [defense counsel] says that well, 1/32nd of an

15     ounce wouldn't matter to somebody.  You know what, that's 40 bucks.  That's $40 of

16     marijuana.  To some people, $40 is a significant amount.  It's $40 of marijuana that he

17     bought, that he was entitled to. He paid for that.  He wanted what he paid for.  And I'm

18     sure he was pissed that not only was he cheated out of that $40, but he was cheated.  So

19     this $40 is significant to a lot of people.'

20

21     Contrary to defendant's argument, the prosecutor's argument that the taking of the cell

22     phone could not support a claim of self defense was not a misstatement of the law.  It was

23     argument based on a reasonable interpretation of the evidence at trial.  Likewise, contrary

24     to defendant's argument, the argument does not 'imply[ ] that Osana's attempt to recover

25     the missing marijuana, even by force, would not be robbery' or that Saga could assert a

26     'claim of right' to the money or marijuana as a defense to robbery.  As noted above, the

27     jury was properly instructed that the killing may be justified if, among other things,

28     defendant reasonably believed that he was in imminent danger of being robbed.  Nothing

United States District Court
Northern District of California

1    in the prosecutor's closing argument misstated or misled the jury with respect to the

2    applicable law."

3    *Chandra*, 2015 WL 3750001, at *8-11.

### 5.    Appealing to the jury's passions and prejudices.

5    As a closing allegation of misconduct, Chandra says that the prosecutor improperly

6    appealed to the jury's sympathy for Saga, and urged the jury to convict Chandra to address a larger

7    social problem of drug dealing.[4]  Dkt. No. 42 at m-24-25.  The court of appeal rejected these

8    arguments:

9        "Defendant argues that the italicized portion of the following argument includes an

10       improper appeal for sympathy for Saga:  'Another important guideline is that sympathy

11       may not influence your decisions.  Right?  You can't consider sympathy or, on the other

12       hand prejudice.  Ironically, ... in a murder case, there's usually more sympathy for the

13       defendant than for the victim.  I know that sounds odd.  I guess it's because you don't get

14       to see the victim.  He doesn't come here and testify.  You see the defendant who's dressed,

15       you know, in normal civilian clothing, who's in ... a secure courtroom with a deputy

16       sheriff, who's well behaved.... So you don't see the defendant that the victim saw on

17       August 29th, 2010.  And then you add to that that if a mother testifies, you know, that's

18       going to be sympathetic for you.  I understand you're all human here.  And those things

19       can kind of play on your sympathy for the defendant.  The fact that the defendant after he

20       was caught, right, was scared and cried a little.... Sort of the flip side of that is imagine if

21       the facts were that this was an attempted murder case and [Saga] had survived.  Say the

22       gunshot went through his chest and hit his spine and he comes up and testified.  You

23       wouldn't be able to consider that.  And that would be powerful.  *I mean, to talk about how*

24       *he can't play with his three young sons outside any more or make love to his wife, I mean,*

25       *that could really pull at your heart strings.  But you wouldn't be able to consider that.  You*

---

[4] Chandra suggests that it was misconduct for the prosecutor to suppress the evidence of Saga's prior conviction, as discussed in Section II. Dkt. No. 42 at m-25.  As discussed, the court of appeal reasonably determined that there was no *Brady* suppression and consequently no prosecutorial misconduct.  *Chandra*, 2015 WL 3750001, at *12-13.

*wouldn't be able to consider that sympathy.*  So I just say that on either side, when you go back to deliberate, if you feel sympathetic in any way, I understand you're human, but you can't let that affect your verdict.' (Italics added.)

Defendant argues that the use of such a rhetorical technique to suggest the opposite of what is literally stated is misconduct because Saga's family is irrelevant to the proceedings and the only purpose for offering such evidence would have been to impermissibly generate sympathy for his family and prejudice against defendant.  We disagree.  When read in context of the surrounding argument, it does not appear that the prosecutor was intending to improperly influence the jury.  Nor would the passions of reasonable jury been inflamed by the argument.

Defendant also faults the prosecutor for making repeated references to the larger social problems of drug dealing.  The prosecutor stated, 'Drug dealing is a dirty business.  Drug dealers kill each other.  They get in disputes with customers.  It is a dirty business.  And so it's not uncommon for a drug dealer to have a gun on him.  And he has that gun on him so he's ready for a dispute.  If any dispute happens, he's--no matter how big the person or how small the person is, he's got a gun, a loaded gun.'  The prosecutor also argued that 'the problem of putting the gun in the hand of a drug dealer.  No matter how big the guy is who confronts them, in their mind, they're bigger, they got a gun.'  Contrary to defendant's argument, the jury would not reasonably have understood the prosecutor's references to 'drug dealers' with 'guns' as a suggestion that the jury should address the problem of drug dealing generally by convicting defendant.  The prosecutor said nothing about sending a message to drug dealers who carry guns; his argument was directed only to what the defendant in this case must have been thinking in arming himself with the gun."
*Chandra*, 2015 WL 3750001, at *13-14.

United States District Court
Northern District of California

27

1

**B.      Discussion**

2      Respondent says that Chandra's prosecutorial misconduct claims are procedurally

3  defaulted and consequently barred from federal habeas review.  Dkt. No. 49-1 at 18-19.  The point

4  is not well taken.  The Court may not review questions of federal law decided by a state court if

5  the decision also rests on a state law ground that is independent of the federal question and

6  adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *see also*

7  *Demacedo*, 2022 WL 4280643, at *9-10.  Procedural default is a specific instance of the more

8  general "adequate and independent state grounds" rule.  *Wells v. Maass*, 28 F.3d 1005, 1008 (9th

9  Cir. 1994).  Our circuit has recognized and applied the California contemporaneous objection rule

10  in affirming denial of a federal habeas petition on grounds of procedural default where there was a

11  complete failure to object at trial.  *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir.

12  2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004); *Fairbank v. Ayers*, 650 F.3d

13  1243, 1256-57 (9th Cir. 2011).

14      But "[i]f a state appellate court overlooks the procedural default and considers an objection

15  on the merits, the state has not relied on the procedural bar and the federal courts may review the

16  claim."  *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2001), *overruled on other grounds by*

17  *Payton v. Woodford*, 299 F.3d 815, 828-29 n. 11 (9th Cir. 2002); *see also Panther v. Hames*, 991

18  F.2d 576, 580 (9th Cir. 1993); *Walker*, 850 F.2d at 473-74 (review on the merits for plain error by

19  a state appellate court negates the defendant's procedural default).  "The state court must 'clearly

20  and expressly state[] that its judgment rests on a state procedural bar' in order for federal review to

21  be precluded."  *Thomas*, 273 F.3d at 1176 (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)); *see*

22  *also Zapata v. Vasquez*, 788 F.3d 1106, 1111-12 (9th Cir. 2015) (federal habeas review precluded

23  where "the state court expressly invoked a procedural bar in addressing [petitioner's] prosecutorial

24  misconduct claim").  Here, the court of appeal did not expressly rely on the procedural default to

25  reject Chandra's claim, and instead exercised its discretion to review and reject the claim on the

26  merits.  *See Chandra*, 2015 WL 3750001, at *6.  Consequently, the claim is not excepted from

27  federal habeas review.

28

United States District Court
Northern District of California

1    Prosecutorial misconduct claims are cognizable in federal habeas review.  The misconduct

2    concern is one of due process and not the broad exercise of a supervisory power.  *Darden v.*

3    *Wainwright*, 477 U.S. 168, 181 (1986); *see also Davidson v. Arnold*, No. 16-cv-03298-JD, 2020

4    WL 1332096, at *5 (N.D. Cal. Mar. 23, 2020); *Miller v. Martinez*, No. 16-cv-06806-JD, 2018 WL

5    3068263, at *8 (N.D. Cal. June 21, 2018).  A defendant's due process rights are violated when a

6    prosecutor's misconduct renders a trial "fundamentally unfair."  *Darden*, 477 U.S. at 183.  This

7    standard of review "allows a federal court to grant relief when the state-court trial was

8    fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of

9    constitutional magnitude."  *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000).

10    "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is

11    the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219

12    (1982).  The federal habeas court must distinguish "between ordinary trial error of a prosecutor

13    and that sort of egregious misconduct … amount[ing] to a denial of constitutional due process."

14    *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974).

15    Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the

16    next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d

17    1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016)

18    (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper

19    comments for AEDPA review purposes).  A prosecutorial misconduct claim is decided "on the

20    merits, examining the entire proceedings to determine whether the prosecutor's remarks so

21    infected the trial with unfairness as to make the resulting conviction a denial of due process."

22    *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation omitted); *see Trillo v.*

23    *Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of

24    the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

25    An important factor in determining whether misconduct amounted to a violation of due

26    process is whether the trial court issued a curative instruction.  When a curative instruction is

27    issued, a court presumes that the jury has disregarded inadmissible evidence and that no due

28    process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S.

United States District Court
Northern District of California

29

at 182.  Other important factors in determining whether misconduct rises to a level of a due process violation include:  (1) the weight of evidence of guilt, *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982-83 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial was required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809-10 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154-55 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 181-82.

Here, the court of appeal's analysis of the alleged misconduct was not contrary to clearly established federal law or objectively unreasonable under AEDPA.  The court reasonably concluded that it was proper for the prosecutor to highlight Chandra's evasive testimony about whether he had threatened a witness, to question Chandra about whether he had studied the law of homicide, and to comment on defense counsel's strategy to delay opening argument.  *See Chandra*, 2015 WL 3750001, at *5-7.  "The prosecutors' comments must be evaluated in light of the defense argument that preceded it," *Darden*, 477 U.S. at 179, and "[t]he prosecutor may argue reasonable inferences from the evidence presented."  *Menendez*, 422 F.3d at 1037.  The court of appeal found that the prosecutor's statements were reasonable responses to arguments made by the defense and grounded in the record.  *See Chandra*, 2015 WL 3750001, at *5-7.  There was no fault in this analysis.

To be sure, some of the statements made by the prosecutor during closing argument were questionable.  For example, the prosecutor simply ad-libbed, without evidentiary support, the characterization that Chandra "slowly" raised the gun and "could have shot [Saga] while chasing him out the door."  *Id.* at *11.  This was more than just an innocent painting of a mental picture.  *See Zapata*, 788 F.3d at 1123 ("That the prosecutor's comments were not a reasonable inference from the record also magnifies their prejudicial impact.").  But the court of appeal reasonably determined that the statements did not render Chandra's trial fundamentally unfair because the prosecutor did not suggest there was evidence to support his statements, the jury was instructed to

use only the evidence presented, and the evidence was "fairly consistent regarding the manner in which defendant held and fired the gun." *Chandra*, 2015 WL 3750001, at *11. This analysis was consistent with the record and clearly established federal law. *See Darden*, 477 U.S. at 182; *cf. Zapata*, 788 F.3d at 1122 ("[T]he likelihood the jury's decision was influenced by the prosecutor's egregious and inflammatory closing argument is heightened because the evidence against [petitioner] was weak, and the eyewitness and circumstantial evidence was far from overwhelming.").

For the prosecutor's suggestion that Saga may have been ducking when he was shot, the court of appeal correctly found that the inference was "within the bounds of permissible argument." *See Chandra*, 2015 WL 3750001, at *11; *see United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1992) ("[P]rosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence.").

The court of appeal's determination that several of the challenged statements were proper statements of law was also reasonable. *See Chandra*, 2015 WL 3750001, at *8-11; *Donnelly*, 416 U.S. at 647 ("A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").

For the prosecutor's actual misstatements of law, the court of appeal reasonably determined that they were not unduly prejudicial. In particular, the statement that "[w]hen somebody is convicted of voluntary manslaughter, they're getting away with murder," was a misstatement of law and improper. *See Chandra*, 2015 WL 3750001, at *8. But the given the context in which the statement was made, and the fact that the trial court provided the clear and correct instructions that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone' either in the heat of passion/sudden quarrel or with imperfect self-defense," it was reasonable for the court of appeal to conclude that the jury would have not have understood the statement as a statement of the law. *See id.*; *Darden*, 477 U.S. at 182.

For the prosecutor's alleged appeals to the passions and prejudice of the jury, the Court respectfully disagrees with the conclusion that "it does not appear that the prosecutor was intending to improperly influence the jury" when he referred to Saga's wife and children. *Chandra*, 2015 WL 3750001, at *13; *see Zapata*, 788 F.3d at 1114-15 (prosecutor committed misconduct when he presented a fictional account of the victim's last words "designed to inflame the passions of the jury"). The statements about Saga's family cannot reasonably be understood as anything other than a ploy for the jury's sympathy for Saga, and they were unsupported by the record and irrelevant to the charges. However, the court of appeal ultimately reached the reasonable conclusion that, in the context of the surrounding argument where the prosecutor stated the jury could not rely on sympathy for Saga or Chandra, the statement would not have affected a reasonable jury's ability to judge the evidence fairly. *See Chandra*; 2015 WL 3750001, at *13; *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (a prosecutor's closing argument "must be judged in the context of the entire argument and the instructions"). The court of appeal also reasonably determined that the prosecutor was not calling upon the jury to protect community values or deter future lawbreaking when he referenced drug dealers during the closing argument. *See Chandra*, 2015 WL 3750001, at *14.

Overall, the prosecutor's conduct was not a model of professionalism or good lawyering. But the Court cannot say that the conclusions reached by the court of appeal to turn away Chandra's misconduct claims were contrary to, or an unreasonable application of, clearly established federal law. Habeas relief is denied on this claim.

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

Chandra's fourth claim for habeas relief is that defense counsel was ineffective. He argues that defense counsel failed to investigate and discover the details of Saga's criminal history, failed to call Chandra's brother to testify regarding Saga's reputation for violence, and misstated the law of homicide in closing argument. Dkt. No. 42 at m-25-28. He also says defense counsel was ineffective in failing to object to the trial court's refusal to instruct the jury with CALCRIM No. 3477, and failing to object to the alleged prosecutorial misconduct. *Id.* at m-13-15, m-25-28.

**A.      Background**

The court of appeal rejected this claim:

"Defendant contends he received ineffective assistance of counsel in two respects.  First, he faults his trial counsel for failing to reasonably investigate Saga's criminal history and thereby uncover details of Saga's 2003 conviction, as well as other exculpatory information about Saga's violent history, including that defendant's brother believed Saga 'had had a reputation in Hayward for beating up people and robbing them for money.' Defendant's habeas petition alleges that defendant's brother told counsel that he had been willing to testify as a witness about Osana's reputation, but that defense counsel didn't want to call him as a witness.  The record does not reflect what investigation if any, defense counsel conducted and what reasons, if any, defense counsel had for not calling defendant's brother testify. [11]

[11] In his habeas petition, defendant alleges:  'On August 1, 2014, counsel for petitioner sent a letter to defense counsel containing a series of questions about whether he had any tactical reasons for various actions he took or failed to take in his investigation of the case and at trial.... On or about September 23, 2014, defense counsel spoke with counsel Robert Beles and acknowledged that he had received the letter, but offered no reasons for the acts and omissions described in the letter.'  The August letter, however, is addressed almost exclusively to counsel's failure to object to the alleged prosecutorial misconduct and does not specifically address this issue.

We need not consider whether counsel's performance was deficient because any error was not prejudicial.  The probative value of the additional evidence identified by defendant was relatively minimal.  The credibility of defendant's brother was severely diminished by the evidence that he and defendant discussed inducing Huan to lie about the victim's having a gun and his possible involvement in attempts to discredit or intimidate Hudieb.  While the details of Saga's prior conviction support defendant's claim that Saga had a propensity for

33

violence, the undisputed evidence established that Saga initiated the assault on defendant.
Although there was significant dispute regarding the extent of the physical assault, there is
no dispute that it was initiated by Saga without provocation by defendant.  Despite this
undisputed evidence, the jury rejected defendant's claim of self-defense, both complete
and imperfect.  There is no reason to believe that additional evidence concerning Saga's
propensity for violence would have resulted in a more favorable outcome for defendant.

Defendant also contends trial counsel prejudicially misstated the basic law of homicide in
his own closing argument.  He argues, 'In his own closing argument, defense counsel did
not appear to be familiar with the basic law of homicide.  He repeatedly made gross
mistakes that the prosecutor promptly, and correctly, objected to.  He repeatedly insisted
that second degree murder required a showing of intent to kill, attempted to back pedal by
arguing that what he meant was that, since petitioner wasn't 'shooting randomly in the
garage for no reason,' he either intended to kill or was shooting in self defense, but then
returned to his erroneous argument that second degree murder required an intent to kill.  Of
course, it does not--petitioner, in theory, could have fired his gun with conscious disregard
for human life, but intending only to scare or wound [Saga], and would then have been
guilty of second degree murder.  Second degree murder requires only a finding of malice,
not an intent to kill.  Defense counsel also argued that to find murder, the jury would have
to believe that defendant was 'completely unafraid' and 'wasn't scared.'  This was an
obvious misunderstanding of the law of self defense that again the prosecutor promptly,
and correctly, objected to.  Petitioner could have been 'scared' and not acted in self
defense, as self-defense requires the defendant to be 'scared' of a particular thing--
imminent robbery or imminent infliction of great bodily injury if he does not defend
himself.'

We disagree with defendant that counsel misstated the law.  A fuller reading of the closing
arguments establish that defense counsel did not ignore that 'conscious disregard for

human life' could support a conviction for second degree murder or argue that defendant could not be afraid and still commit second degree murder.  Rather, counsel was arguing how he believed the law should be applied to the facts of this case.  His argument was, in general terms, that defendant shot at Saga (either to kill him or to scare him) because he was surprised and provoked (heat of passion) or afraid (self-defense) in which case he was either not guilty or guilty only of manslaughter.  Defense counsel argued to the jury that 'to convict defendant of murder, you must believe that he wasn't afraid, in fear of great bodily injury, had no reason to fear that with two huge men in his house.  But on the other hand, when confronted with this, all of a sudden, with no warning, he didn't react suddenly, he was contemplative.  And he decided when faced with this, holy cow, I've got two giant men in my house, they're all mad at me, things are getting physical, but I'm calm, I'll just kill one of them.'  Obviously there are nuances missing from this argument, but we cannot say, as defendant suggests, that trial counsel's argument 'shows that [trial counsel] undertook the defense of a murder case where petitioner's main defense was self-defense, without being familiar with the basic law of either homicide or self defense and without familiarizing himself with such law before the trial.'  Nor did the prosecutor's objections and rebuttal argument, in which he emphasized that second degree murder did not require an intent to kill, make 'it appear that the jury could not rely on anything defense counsel said.'"

*Chandra*, 2015 WL 3750001, at *14-15

### B.  Discussion

The Sixth Amendment guarantees effective assistance of counsel to defendants in criminal cases.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for a claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be said to have produced a just result.  *Id.*

To prevail on a Sixth Amendment ineffectiveness claim, Chandra must first demonstrate that defense counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88; *see also Davidson*, 2020 WL 1332096, at *5.

35

1 Second, he must establish that he was prejudiced by the deficient performance in that "there is a

2 reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

3 would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a

4 probability sufficient to undermine confidence in the outcome." *Id.* In addition, "[t]he likelihood

5 of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86,

6 112 (2011). The *Strickland* prejudice analysis is complete in itself, and there is no need for

7 harmless error review under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Musladin v. Lamarque*,

8 555 F.3d 830, 834 (9th Cir. 2009).

9   On habeas review, the Court defers to defense counsel's tactical choices, and the state

10 court's determination of whether those choices were reasonable. *See Yarborough v. Gentry*, 540

11 U.S. 1, 6 (2003) (review is "doubly deferential when it is conducted through the lens of federal

12 habeas"); *see also Zapata*, 788 F.3d at 1115; *Davidson*, 2020 WL 1332096, at *8. The Court

13 looks to whether "it would have been reasonable to reject [Chandra's] allegation of deficient

14 performance for any of the reasons expressed by the court of appeal." *Cannedy v. Adams*, 706

15 F.3d 1148, 1159 (9th Cir. 2013). "[B]ecause of the difficulties inherent in making the evaluation,

16 [the Court] must indulge in a strong presumption that counsel's conduct falls within the wide

17 range of reasonable professional assistance; that is, [Chandra] must overcome the presumption

18 that, under the circumstances, the challenged action might be considered sound trial strategy."

19 *Tilcock v. Budge*, 538 F.3d 1138, 1146 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 689).

20   Chandra has not overcome that presumption. He has not demonstrated that he was

21 prejudiced by defense counsel's failure to investigate Saga's criminal history. *See Chandra*, 2015

22 WL 3750001, at *14. To the contrary, the record amply supports the court of appeal's conclusion

23 that the probative value of the evidence that defense counsel failed to investigate was minimal, and

24 that further evidence of Saga's propensity for violence would not have changed the outcome of the

25 trial. *Id.* Nor has Chandra shown that defense counsel's statements regarding the law of homicide

26 during closing argument fell below an objective standard of reasonableness. As the court of

27 appeal explained, counsel was arguing how he believed the law should be applied to Chandra's

28 case, and the record did not suggest that he was unfamiliar with the basic relevant law. *Id.* at *15.

United States District Court
Northern District of California

1    And even if defense counsel had been more precise in his closing argument, Chandra has not

2    shown a substantial likelihood of a different outcome because the trial court correctly instructed

3    the jury on the law of homicide, manslaughter, and self-defense. *Id.* at *7-8.

4         For Chandra's argument that defense counsel was ineffective for failing to object to the

5    trial court's refusal to give the CALCRIM No. 3477 instruction (discussed in Section I), the court

6    of appeal implicitly and reasonably rejected this claim when it found there was no instructional

7    error. *Id.* at *3-4.

8         Chandra faults the court of appeal for failing to hold an evidentiary hearing where defense

9    counsel could be cross-examined about his failure to object to the alleged acts of prosecutorial

10   misconduct. *See* Dkt. No. 42 at m-26-27. But the significance of defense counsel's failure to

11   object to alleged prosecutorial misconduct turns on whether the prosecutor actually committed

12   misconduct. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (the merits of the

13   underlying claim determine the ineffective assistance of counsel claim because "counsel cannot

14   have been ineffective for failing to raise a meritless objection"). As discussed above, the court of

15   appeal reasonably determined that the prosecutor did not commit prejudicial misconduct, and it

16   consequently was reasonable for the court to reject Chandra's ineffective assistance of counsel

17   claim on this ground. Moreover, "[a]bsent egregious misstatements, the failure to object during

18   closing argument and opening statement is within the wide range of permissible professional legal

19   conduct." *Cunningham*, 704 F.3d at 1159 (internal quotations omitted). Habeas relief is

20   consequently denied on the ineffective assistance of counsel claim.

21   **V.    CUMULATIVE ERROR**

22        Chandra's fifth claim for habeas relief is that the cumulative effect of the alleged errors

23   violated his right to a fair trial. Dkt. No. 42 at m-28-29. In some cases, although no single trial

24   error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still

25   prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334

26   F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors

27   hindered the defendant's efforts to challenge every important element of proof offered by the

28   prosecution). But where there is no single constitutional error existing, like in this case, nothing

United States District Court
Northern District of California

37

1    can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524

2    (9th Cir. 2011).  Chandra raised a cumulative error claim in his state habeas petition, and the court

3    of appeal implicitly and reasonably held that there were no constitutional errors to cumulate.  *See*

4    Dkt. No. 17-2 ¶ 124, m-61; *Chandra*, 2015 WL 3750001, at *1.  Habeas relief is denied on this

5    claim.

6    ## VI.    RETROACTIVITY OF SECTION 12022.53(H)

7         Chandra's closing claim for habeas relief is that Section 12022.53(h) of the California

8    Penal Code, which gives trial courts discretion to strike firearm enhancements from sentences,

9    applies retroactively to his sentence.  Dkt. No. 42 at m-29-32.  The Alameda County Superior

10   Court rejected this claim, and the state court of appeal affirmed without an opinion.  Dkt. No. 49-

11   3, Exs. 15, Ex. 17.

12        ### A.    Background

13        As the superior court stated, California Senate Bill 620 (SB 620), which went into effect on

14   January 1, 2018, amended Section 12022.53(h) of the California Penal Code to provide sentencing

15   courts with discretion to strike firearm enhancements.  Dkt. No. 49-3, Ex. 15 at 2.  Under the

16   presumption of retroactivity in *In re Estrada*, 408 P.2d 948 (Cal. 1965), California courts have

17   "unanimously concluded that [SB 620's] grant of discretion to strike firearm enhancements under

18   section 12022.53 applies retroactively to all nonfinal convictions."  Dkt. No. 49-3, Ex. 15 at 2

19   (quoting *People v. Hurlic*, 235 Cal. Rptr. 3d 255, 260 (Cal. Ct. App. 2018)).  "A case is final, for

20   purposes of retroactively applying statutory amendments, when the time for petitioning the United

21   States Supreme Court for a writ of certiorari expires."  *Id.* at 3 (citing *People v. Harris*, 231 Cal.

22   Rptr. 3d 768, 769 n.2 (Cal. Ct. App. 2018)).  The superior court determined that, because the

23   California Supreme Court denied review of Chandra's appeal on September 16, 2015, his

24   conviction was final prior to the effective date of SB 620 and he was not entitled to retroactive

25   relief.  *Id.*

26        The superior court also concluded that Chandra "has not demonstrated that denying him

27   the benefit of SB 620 would violate equal protection or due process."  *Id.*  It found that Chandra,

28   "who was convicted and sentenced before the enactment of SB 620, is not similarly situated, for

United States District Court
Northern District of California

1   purposes of the law, to someone who's case was not yet final when SB 620 was enacted," and

2   explained that the "Fourteenth Amendment does not forbid statutes and statutory changes to have

3   a beginning, and thus to discriminate between the rights of an earlier and later time." *Id.* at 3-4

4   (quoting *People v. Floyd*, 72 P.3d 820, 827 (Cal. 2003) (quoting *Sperry & Hutchinson Co. v.*

5   *Rhodes*, 220 U.S. 502, 505 (1911))).

6          **B.      Discussion**

7          Federal courts must defer to state courts' interpretations of state sentencing laws.  *See*

8   *Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)

9   ("federal habeas corpus relief does not lie for errors of state law").  "Absent a showing of

10  fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify

11  federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *see, e.g., Miller v.*

12  *Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (whether assault with deadly weapon qualifies as

13  a "serious felony" under California's sentence enhancement provisions, Cal. Penal Code §§ 667(a)

14  and 1192.7(c)(23), is question of state sentencing law and does not state constitutional claim).

15         Chandra has not shown that denying him the benefit of the retroactive sentencing law

16  results in fundamental unfairness, so the retroactivity of Section 12022.53(h) is consequently not a

17  question for federal habeas review.  Although his amended petition characterizes this claim as a

18  violation of his constitutional rights, *see* Dkt. No. 42 at m-33-35, Chandra cannot "transform a

19  state-law issue into a federal one merely by asserting a violation of due process." *See Langford v.*

20  *Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Moor v. Palmer*, 603 F.3d 658, 661 (9th Cir.

21  2010).  Moreover, the superior court correctly applied federal law to reject his equal protection

22  and due process claims. *See* Dkt. No. 49-3, Ex. 15 at 3-4.

23                                      **CONCLUSION**

24         The petition is denied.  The federal rules governing habeas cases brought by state prisoners

25  require a district court that issues an order denying a habeas petition to either grant or deny therein

26  a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).  The certificate of

27  appealability is also denied.

28

United States District Court
Northern District of California

The Court may grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Chandra has not shown a certificate is warranted, and so it is denied.

**IT IS SO ORDERED.**

Dated:  October 7, 2022

_____
JAMES DONATO
United States District Judge